## INTERNATIONAL PAPER CO. v. BEACON OIL CO.

(Circuit Court of Appeals, First Circuit.   June 4, 1923.)

No. 1618.

**1. Sales ☜71(4)—Contract as to quantity construed.**

A contract to purchase buyer's requirements of oil for a year, up to a maximum of 550,000 barrels per annum, giving seller option, in case the quantity contracted for was not taken within the contract period, to continue deliveries until the contract quantity had been or should be taken by the buyer, but with force majeure clause excusing other party's failure to perform, *held* to obligate the buyer at seller's option to take the full estimate of 550,000 barrels, except as such obligation was cut down by deductions under the force majeure clause, which was not limited to the effect of a strike in buyer's own plant, but included strikes in the plants of buyer's customers, preventing buyer's normal operation of its plant.

**2. Interest ☜47(2)—On damages held not allowable from date of suit.**

In seller's action for buyer's failure to receive goods sold, *held*, that allowing interest from date of the suit was error; the damages not being liquidated.

In Error to the District Court of the United States for the District of Massachusetts; John A. Peters, Judge.

Action by the Beacon Oil Company against the International Paper Company. Judgment for plaintiff and defendant brings error. Reversed and remanded.

Frank T. Benner and Charles F. Choate, Jr., both of Boston, Mass., for plaintiff in error.

Thomas Hunt, of Boston, Mass. (Dunbar F. Carpenter, of Boston, Mass., on the brief), for defendant in error.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge. The oil company's suit against the paper company, for breach of a written contract to purchase oil for the year 1921, resulted in a verdict for the plaintiff of $390,143.60. The contract is on a printed form prepared by the oil company, and is as follows, typewritten insertions being printed in italics:

"Sales Contract Beacon Oil Company, 111 Devonshire St., Boston, Mass.

"Memorandum (in duplicate) of sale made on this *fourth* day of *October*, 1920, between the Beacon Oil Company (hereinafter called the seller) and the *International Paper Company* of *New York* (hereinafter called the buyer).

"Product: *Beacon fuel oil.*

"Specifications: *Gravity—13/16° Baume.   Flash—not under 150° F. closed cup.   Water and/or sediment—not over 1%.*

"Base price: *$3.50 per barrel of 42 U. S. gallons f. o. b. cars, Everett, Mass.*

"Terms of payment: *On 25th of each month for shipments made in first*

*half of same month and on 10th of each month for shipments made in last half of previous month.*

"Contract starts: *About January 1, 1921—buyer to give seller timely notice of date it desires shipments to start.*

"Contract terminates: *On December 31, 1921.*

"Quantity: *Buyer's requirements for its Rumford and Livermore mills up to maximum of 550,000 barrels per annum.*

"Rate of delivery: *Approximately equal monthly quantities according to buyer's requirements, but not over 55,000 barrels in any one month.*

"Mode of delivery: *Tank car lots. Seller to furnish cars necessary for accomplishing delivery under normal transportation conditions.*

"Destination: *Buyer's mills at Rumford and Livermore Falls, Maine.*

"And the provisions printed *and typewritten* on the succeeding pages hereof, except those that by their terms are inapplicable, are parts of this contract.

> "Beacon Oil Company,
> "By *H. L. Wollenberg, Vice Pres. & Gen. Manager.*
> "*International Paper Company,*
> "By *G. E. Smith, Manager Purchasing Department.*"

Then follow two pages of "Provisions of Contract," largely immaterial and sufficiently shown by the headings of the paragraphs and by excerpts, as follows:

"Sale. By this memorandum the seller sells and agrees to deliver, and the buyer purchases and agrees to pay for, the goods mentioned within. Unless specifically provided to the contrary by the parties hereto, the product sold hereunder is to be used by the buyer exclusively for its own requirements, and is not to be resold by the buyer without the written consent of the seller. * * *

"Tests and Measurements."—Immaterial.

"Claims."—Immaterial.

"Payments."—Immaterial.

"Taxes."—Immaterial.

"Freight rates."—Immaterial.

"Monthly Shipments.—If the contract extends over a period of months, shipments of deliveries shall be in equal monthly quantities unless otherwise stated in the memorandum, the buyer having the option of varying the monthly quantities by 10 per cent: Provided that, subject to the other provisions of this contract, the agreed quantity must be taken within the time fixed. The buyer shall give the seller at least 10 days' previous notice of the quantity required in any month, which quantity shall then become the fixed amount deliverable during such month."

"Tank Cars."—Immaterial.

"Deliveries by Seller's Barge."—Immaterial.

"Approximate Quantities.—In case deliveries are made in carload, bargeload, or tank wagon lots, deliveries within 10 per cent. of amounts called for by the contract or any installment thereof shall be deemed sufficient deliveries by the seller, only the actual amounts delivered to be paid for.

"Storage Capacity.—The buyer shall provide storage capacity equal to at least *one month's requirements*, and the seller may anticipate deliveries hereunder to any extent permitted by such storage facilities. The buyer shall furnish unloading facilities providing capacity for unloading in any day a number of cars at least equal to one week's normal requirements."

"Force Majeure.—Neither party shall be responsible for delays, failure, or omissions hereunder due to any cause beyond its control, wheresoever arising and not due to its own negligence and which cannot be overcome by the exercise of due diligence, including labor disturbances, riots, fire, earthquake, flood, storm, lightning, epidemic, war, disorders, hostilities, expropriation or confiscation of properties, failure of and delays by carriers, interference by civil or military authorities, whether legal or de facto, and whether purporting to act under some constitution, decree or law, or otherwise, acts of God, perils of the sea, etc., whether or not the cause be of the same class or kind as those enumerated above, such enumeration being expressly under-

stood to be in nowise exclusive of other causes or classes of causes; nor shall the Seller be responsible for any delay, failure, or omission hereunder due to the failure to receive at its Everett refinery its supply of crude petroleum from the party or parties with whom it is under contract for crude oil from which it intends to manufacture the product hereunder. In any such case the operation of this contract so far as necessary shall be suspended without liability for damages, it being understood that the cause of such interruption shall be remedied, if possible, with all dispatch and performance resumed at the earliest practicable time after cessation of such interruption.

"If deliveries are interrupted for any of the causes embraced in the foregoing, the amount of product which is not delivered at the regular contract rate during the period of any such suspension or reduction shall be deducted from the full amount which otherwise would have been delivered under this contract, and the seller shall not be under any obligation to make up such omitted deliveries either during the contract period or after the termination thereof.

"No Tender Required.—In case of failure of the buyer to accept delivery hereunder, no physical tender of product by the seller shall be necessary, but written notice of the seller's readiness and willingness to deliver any quantity of the product at any time specified shall be equivalent to physical tender thereof.

"General Conditions.—This contract shall take effect and shall be construed in accordance with the laws of the state of Massachusetts.

"This contract shall not be assignable by either party without the written consent of the other. It shall bind and benefit the successors of the respective parties.

"Extension of Contract Period.—*It is understood that the quantity covered by this contract is based on the buyer's estimate of its requirements, and in the event the buyer does not take the quantity contracted for hereunder within the contract period, the seller may at its option, to be exercised in writing 30 days before the expiration of the contract period, either terminate deliveries at the end of the contract period or continue deliveries until the contract quantity has been taken by the buyer, in which case all the terms and provisions of this contract shall be accordingly extended.*"

There was no dispute that paper company actually took, during the year 1921, 268,802.67 barrels of oil; that the oil company by written notice seasonably exercised any option it had to continue deliveries after the expiration of the year; and that the paper company refused to accept any oil after December 31, 1921.

The paper company's assignments of error involve three main contentions:

(1) That the contract bound the paper company only to the extent of its actual requirements, and not, as the District Court ruled, to its maximum estimate of 550,000 barrels at the plaintiff's option under the extension clause.

(2) That, even if the paper company was otherwise bound to take the maximum estimate of 550,000 barrels, yet, under the force majeure clause, all oil not required by the defendant, by reason of any and all causes beyond its control, should have been deducted, and that the District Court erred in allowing only such deductions as were caused by a strike in the defendant's own mills.

(3) That interest should not have been allowed from the date of the writ.

The crux of the controversy is as to the construction of this contract. Evidence of the preliminary oral and written negotiations was offered by the plaintiff and admitted, apparently without objection,

presumably upon the theory that the written contract was not in terms sufficiently plain and unambiguous. Menage v. Rosenthal, 175 Mass. 358, 56 N. E. 579.

Wollenberg, the plaintiff's general manager, testified that his company began business with the defendant in August, 1920, selling it oil delivered in October, 1920; that on September 13, 1920, he wrote Smith, the defendant's purchasing agent, that he had not forgotten his "promise to take up with you your fuel oil requirements for next year"; that later Smith showed him statistics as to the rate at which the mills had been using oil, more being required in winter; that he—

"stated distinctly to Smith that the form of contract that we could and would make with him would be one to cover their requirements up to some definite maximum to be clearly set forth. I told him that we, in making such contract, not only with one company, but with many companies, and having such contracts on our books, were in the position of 'holding the bag'; that is to say, if the requirements of customers fell below their estimates, we would be left with oil on our hands not sold, and would have been prohibited from previously selling it. I told him that that situation had caused us a good deal of concern, and that as one protection, although not entirely adequate, but as one protection against that—I told Mr. Smith that any contracts that we were making covering extended periods included a provision for an option to ourselves, to extend the contract period in the event that the buyer, by reason of having improperly or incorrectly estimated his requirements, failed to take the maximum quantity covered by the contract, within the period stated. I called attention to that very specifically and pointed out to him in the conversation that the contract dated August 27, previously executed, between the same parties covering deliveries to be finished up in 45 or 50 days, did not carry any such option clause. Mr. Smith said to me that he understood the situation, that he comprehended the situation, and said nothing which indicated any objection."

Smith then in Wollenberg's presence dictated a letter saying:

"We hereby accept your proposition to supply us with approximately 500,000 barrels, * * * approximately 45,000 barrels per month under normal conditions. * * * It is understood you will submit to us the contract in triplicate, covering the proposition in general."

Later, the estimate was raised to 550,000 barrels, and the contract, supra, was so written. Smith did not testify.

## I.

[1] Defendant's learned counsel strenuously contend that, notwithstanding the extension clause, the contract still remains a requirement contract. They stress the familiar rules that, in a contract drawn by plaintiff, ambiguities must be construed in defendant's favor, and that contracts optional in respect to one party are construed strictly in favor of the party bound. Williston on Contracts, §§ 620, 621. But against this we have the controlling considerations that the extension clause is added, in writing, at the end of the printed contract; that it must be given some operation; that, if the defendant's obligations were absolutely limited by its requirements, there would be nothing to which to apply the extension clause.

We cannot accede to the defendant's contention that the extension clause was put in, in order to meet the contingency arising out of the fact that, when the contract was signed in October, 1920, the

defendant had an outstanding contract with another company which might lap over into the new year, so that the new contract was framed to start "about January 1, 1921—buyer to give seller timely notice of date it desired shipments to start." This possible overlapping was a trifling matter; in fact, there was none, for deliveries under the new contract began on December 29 or 30, 1920. Apart from the effect of the extrinsic evidence, this would be no adequate explanation of the existence of this important provision, in writing, at the end of this elaborate printed contract. But if we resort to the extrinsic evidence, which is treated by both counsel as competent on the question of construction, it is clear that the plaintiff's selling agent explicitly told the defendant's purchasing agent that the extension clause was to be inserted in order to protect the plaintiff against incorrect or improper estimates, and so as to have a contract covering requirements up to some definite limit. It follows that the District Court was right in ruling that the plaintiff was entitled, availing itself, as it did of the optional clause, to require the defendant to take the full estimate of 550,000 barrels, except so far as this obligation was cut down by the force majeure clause.

## II.

But we think the District Court too narrowly limited the operation of the force majeure clause. There was abundant evidence tending to show that, owing to frequent changes in styles and to the rapid deterioration of news print in storage, such a paper business as the defendant's was invariably carried on upon orders; that the storage capacity of such mills was almost negligible; that operations at such mills are not merely financially dependent upon market conditions, but are in effect physically blocked when sales stop; that the chief customer of the Rumford Mill was the Continental Paper Bag Company, whose mill was next door, so that the defendant's product was shipped directly into the Continental Company's plant; that the employees of the Continental struck in May, 1921, and stayed out several weeks after the Rumford mill had resumed operations, so that this important outlet for defendant's product was blocked. Without further statement of the evidence, it is plain that a jury would have been warranted in finding that, apart from the effect of the strike in the defendant's own mill, which began in May and lasted until well into the fall, the defendant's normal operations were cut down by causes beyond its control, and which it could not overcome by any exercise of due diligence.

Turning, now, to the force majeure clause: We observe at the outset that its scope is not to be determined by its title; for we find in the body of the clause provisions plain and unmistakable. We need not, therefore, resort either to the civil or to the common law for rulings as to force majeure or vis major, in order to determine the meaning and application. While this provision is found in a printed contract, drawn by the plaintiff, and doubtless intended primarily for its protection, we must construe the applicable provisions no less favorably to the defendant than they would be construed in favor of

the plaintiff, if conditions were essentially reversed; that is, if, after the plaintiff had made a contract to supply the defendant's fuel oil requirements, the price of oil had greatly increased, and the plaintiff had met, in obtaining a supply, with obstacles "beyond its control," "and which could not be overcome by the exercise of due diligence." The clause as drawn is applicable to both parties. It provides explicitly that:

"Neither party shall be responsible for * * * omissions hereunder due to any cause beyond its control, wheresoever arising, not due to its own negligence and which cannot be overcome by due diligence, including labor disturbances," etc.

There follows a long illustrative enumeration; but, fearing the maxim "expressio unius exclusio alterius," the clause continues:

" * * * Such enumeration being expressly understood to be in no wise exclusive of other causes or classes of causes."

Then follows an additional provision exonerating the seller from responsibility for omissions, etc.:

"Due to the failure to receive at its Everett refinery its supply of crude petroleum from the party or parties with whom it is under contract for crude oil," etc.

All the foregoing is found in one sentence. There then follows, in a separate sentence, and obviously applicable to omissions of both parties:

"If deliveries are interrupted for any of the causes embraced in the foregoing, the amount of product which is not delivered at the regular contract rate during the period of any suspension or reduction shall be deducted from the full amount which otherwise would have been delivered under this contract. * * *"

Plainly, this is much more than a strike or vis major clause. It, in plain terms, relieves both parties to this contract from responsibility for omissions due to causes beyond their control, which cannot be overcome by the exercise of due diligence, and provides for deducting the amount of such omissions from the contract quantity. To limit the clause, as in effect it was limited by the court below, to the effect of a strike in the defendant's own plant, amounts to permitting the enumeration of various causes to control the broad and inclusive language of the first part of the clause, and to override the caveat at the end of the enumeration to the effect that such enumeration shall "be in no wise exclusive of other causes or classes of causes."

The defendant's sixth request for rulings is as follows:

(6) "If the court, contrary to the defendant's prayers for rulings, rules that the quantity contemplated by the extension clause is 550,000 barrels, then the defendant requests the court to rule that there must be deducted from this quantity under the force majeure clause all the oil not required by the defendant, by reason of any and all causes beyond the defendant's control."

The court refused this ruling, and the defendant duly excepted. This refusal, at any rate when taken in connection with the court's instruction that the jury should deduct from 550,000 barrels only the aggregate of the amount taken and of the amount not taken on account of the strike in the defendant's own mills, was error.

Perhaps, as an abstract proposition, the court's instruction that the force majeure clause does not apply to "lack of market" or to the "ordinary vicissitudes of business" is correct; but there was abundant evidence that the defendant faced conditions outside those caused by the strike in its own mills, which went far beyond "the ordinary vicissitudes of business" or a "lack of market," as the term "lack of market" would ordinarily be understood, and the jury were not allowed to consider these conditions as grounds for deductions. It is plain that the nature of the business of both plaintiff and defendant was much like the business of a railroad. It must flow in a current; otherwise, there are obstacles which due diligence cannot overcome. The force majeure provision was drawn to protect both buyer and seller from the destructive effects of such blockading.

The plaintiff's argument that, if the force majeure clause is thus applied to the obligations of the paper company, the extension clause is stripped of all meaning, is not sound. The two clauses are not mutually exclusive. There is no logical or legal justification for applying this clause to a strike in the defendant's own mills, without applying it to the entire situation fairly covered by its terms. While the record is not entirely clear, we infer that the plaintiff did not except to the court's ruling that the force majeure clause applied to the strike in the defendant's mills. The plaintiff's present contention, that the very presence of a force majeure clause applicable to both parties is inconsistent with the view that the contract is a requirement contract as to the obligations of the buyer, while logical, is therefore inconsistent with the position apparently taken by the plaintiff at the trial, and plainly inconsistent with the ruling of the court below. Moreover, this contention overlooks that the primary purpose of the extension clause was to protect the plaintiff against improper or incorrect estimates; that on the evidence of its own chief witness the extension clause was put in, not for the purpose of throwing upon its customers a burden of responsibility for causes beyond their control and which they could not overcome by the exercise of due diligence, but to make them liable for reckless, even for improper or inaccurate, estimates of their requirements under normal conditions.

Wollenberg's stated reason for this extension clause was not that his company had suffered under requirement contracts from the prevention of deliveries by causes beyond its customers' control and operating during the life of the contracts; it was that it had made contracts to supply itself with oil and for ships to carry the oil, grounded upon estimates improper and inaccurate. And Wollenberg said that he therefore proposed thereafter, through such an extension clause, to protect his company from this abuse. The force majeure clause does not excuse customers for errors or exaggerations in their original estimates of their requirements. Its function is to excuse, pro tanto, from performance, *after* a contract, accurate and otherwise proper, has been made, not to relieve from liability involved in the genesis of the agreement. If, in this case, the plaintiff had alleged and proved that an accurate and correct estimate of the defendant's requirements for fuel oil under normal conditions would have been,

say, 450,000 instead of 550,000 barrels, then, notwithstanding the force majeure clause, the plaintiff would have had an optional right, under the extension clause, to require the defendant to take the excess of 100,000 barrels. And the same result accrues if, under the force majeure clause, deductions from the 550,000 maximum are limited to those due to causes beyond the defendant's control, arising within the contract period and reducing the defendant's consumption of oil below its original estimate, which must be assumed to have been a proper and an accurate estimate. While the defendant contracted that its requirements would, under normal conditions, be 550,000, and that if the plaintiff exercised its option, as it did, it would take and pay for that amount, it nevertheless had a right, if it could sustain the burden resting upon it in that regard, to show that by reason of abnormal conditions, which could not be overcome by due diligence, its takings of oil were diminished below its proper and accurate estimate.

The fact that the defendant agreed, at the plaintiff's option, that its requirements should equal 550,000 barrels, does not prevent the contract from being, in general nature and purpose, a requirement contract. Plainly, as plaintiff's own learned counsel admits, the contract was, so far as the plaintiff's obligations were concerned, a requirement contract, and only that. Plaintiff could not have been held to furnish more than the defendant's requirements in actual experience, even if, because of originally exaggerated estimate and for causes covered by the force majeure clause, the defendant's consumption had been not more than one-half the estimate of 550,000 barrels. Defendant had no right to require oil for resale, even if the price of oil had gone up as much as it went down. But the paper company's agreement fell far short of an absolute agreement to take 550,000 barrels, no matter what contingencies should arise. It agreed only that, unless excused under the force majeure clause, it would take (at plaintiff's option) 550,000 barrels, even if its estimate of its requirements under normal conditions proved excessive. If its original estimate was proper and accurate for normal conditions, the force majeure clause tended to keep the contract a requirement contract, cutting down the paper company's obligation as causes beyond its control cut down its consumption. Without this clause its obligations and its requirements might have been thrown out of all sensible relation to each other.

If the defendant had absolutely contracted (the plaintiff exercising its option) to take 550,000 barrels, there was no occasion to use all the words, as to requirements, found in this elaborate contract. National Publishing Co. v. International Paper Co. (C. C. A.) 269 Fed. 903.

Our construction leaves significant the words in the extension clause, "The quantity covered by this contract is *based* on the buyer's estimate of its requirements"; for plainly, if the "quantity covered by the contract" were, under all possible contemplated conditions, the exact equivalent of the "buyer's estimate," viz. 550,000 barrels, it would not have been stated to be *"based"* on the buyer's estimate." Things are not *based* on themselves. So, also, as to the terms "quantity contracted for hereunder" and "contract quantity"—if these terms had meant, under all conditions, 550,000 barrels, 550,000 barrels would

have been written into the clause. Our construction makes the "contract quantity" subject to the extension clause, mean 550,000 barrels less such amount, if any, as the buyer can show itself excused from taking by causes beyond its control, not existent nor reasonably contemplated when the contract was made.

## III.

[2] The defendant alleges error in the court's instruction that the jury should add interest from the date of the writ, January 9, 1922, instead of from the date of the verdict.

The defendant is right in its contention that the damages must remain unliquidated until the jury should determine the amount of deductions under the force majeure clause, and also the market value of oil at the time delivery should have been made. Counsel agree that the jury found the defendant in default as to taking 138,856 barrels, assessed the market value at 82 cents, and multiplied 138,856 barrels by the difference between the contract price $3.50 and 82 cents—$2.68 —thus reaching a verdict of $372,136.76, to which interest was added from the date of the writ.

We think it was error to add interest from the date of the writ. The authorities cited by the plaintiff do not sustain its proposition. Practically all the cases relied upon hark back to Jackson v. City of Brockton, 182 Mass. 26, 64 N. E. 419, 94 Am. St. Rep. 635, where Chief Justice Holmes says:

"In some cases, where the amount to be paid is unliquidated until the report is filed, it would be unjust to treat the defendant as in default before that time. Under such circumstances the usual practice under Pub. St. c. 171, § 8, is to compute interest from the date of the report. But when the claim is liquidated and should have been paid before action brought, and when the auditor, while allowing interest, has computed it only to the date of the writ, it seems to us proper that, for the judgment, interest should be made up from the same time; that is to say, from the date of the writ."

But in this case the damages were not liquidated. The defendant had no means of determining to what extent if at all it was in default; it could not have paid or tendered, and thus stopped interest. The case, therefore, falls under the rule laid down in such cases as those cited by the defendant. Stephens v. Phœnix Bridge Co., 139 Fed. 248, 71 C. C. A. 374; White v. Miller, 78 N. Y. 393, 34 Am. Rep. 544; Wright v. Barnard (D. C.) 264 Fed. 582; Dresser v. Bates, 250 Fed. 525, at page 552, 162 C. C. A. 541 (C. C. A. First Circuit).

Of course, if this were the only error, the excess interest might be remitted, and judgment entered on the verdict thus revised. Pacific Postal Tel. Cable Co. v. Fleischner et al., 66 Fed. 899, 910, 14 C. C. A. 166.

The judgment of the District Court is vacated, the verdict set aside, and the case is remanded to that court for further proceedings not inconsistent with this opinion, and the plaintiff in error recovers costs in this court.