Booth, Judge,
delivered the opinion of the court:
The plaintiff, a Virginia corporation, is engaged in producing oil and selling petroleum and its products. The cause of action relied upon for judgment in this' case is predicated upon the breach of an express contract. Plaintiff, ,in August, 1920, submitted to the United States Shipping Board a proposal to supply during the calendar year 1921, 9,000,000 barrels of crude and 6,000,000 barrels of fuel oil. The plaintiff’s offer was accepted by the board on August 19, 1920, and a formal written contract as of that date was duly executed by the parties. The contract provided for the sale to the board of the stipulated quantity of oil to be delivered by the plaintiff on board the defendant’s vessel's at Tecomate, Mexico, at the monthly rate of 750,000 barrels of crude and 500,000 barrels of fuel oil, price $1.25 per barrel. A deviation of 10 per centum e,ither more or less was allowed, and the plaintiff’s undertaking was ex *170 pressly conditioned upon its prior commitments to other parties and the capacity of its oil wells to meet deliveries.
From January to May, 1921, the plaintiff supplied and the defendant accepted the full monthly quotas of crude oil and paid for the same. From May until the close of the contract period the defendant did not call for or take the full contract quotas of crude oil, and the plaintiff, subsequent to the month of August, 1921, could not have supplied the same. Along about August 28, 1921, salt Vater, which had from the beginning been a source of anxiety to the plaintiff, made its appearance in the plaintiff’s oil wells to- such an extent as to seriously curtail production, and render impossible plaintiff’s compliance with the exact terms of the contract as to monthly deliveries of ende oil. During the months of May, June, July, and August, 1921, the plaintiff, possessing knowledge that the defendant did not and would not call for or accept delivery of the full monthly quotas of 750,000 barrels of crude oil, did not pump its oil wells to their capacity. In other words, the wells were “pinched,” the supply curtailed by a process of partial pumping, and this practice continued until salt water rendered it inexpedient. Plaintiff, therefore, as to this branch of the case, prefers an alternative claim for damages. First, it is insisted that until the last of August the plaintiff could have, from its actual and potential production, supplied the full contract quotas of crude oil under the contract, and the defendant’s refusal to take the same constitutes a breach of the contract and a corresponding liability to pay therefor. Second, if the defendant is not to respond for the plaintiff’s potential production, defendant is in any event liable for plaintiff’s actual production; i. e., the oil on hand and available for delivery. The record sustains the fact that plaintiff, faced with an absolute refusal to accept full contract quotas of crude oil by the defendant, did “ pinch ” its productive wells, and did not take therefrom all the crude oil they would have produced.
The difficulty encountered in an analysis of the facts as to what the plaintiff terms its “ potential supply ” of crude oil resides in obvious uncertainty as to the quantity. Expert testimony is offered by the plaintiff to establish a potential
*171 supply far in excess of needed, quantities to meet contract requirements until September, 1921. The defendant, on the other hand, meets plaintiff’s experts with an array of its! own, all expert witnesses being of equal skill and personally familiar with the oil situation in this particular Mexican oil field. The wide divergence of expert opinion and the manifest impossibility of reconciling the facts are, we believe, sufficient factors to forestall1 resting a money judgment thereon, even if the contention is otherwise tenable. While potential production may be the single means of fixing present value to a producing oil well, it is by no means a safe criterion upon which to award a fixed money judgment dependent upon a future quantity of oil in the ground and only potentially available. The character of the commodity and the actual experience in oil production from producing wells renders the facts far too speculative and remote.
Plaintiff conceded the encroachment of salt water in its producing wells, and admits that after August it could not have fulfilled contract deliveries. When, therefore, the extensive decline in production is taken into consideration and the sudden and sharp failure óf production is considered, the difficulty of according certainty to potential production is apparent. The court, to award judgment on this basis, must of necessity be able to find that plaintiff’s wells would have, if allowed to produce at a maximum flow, produced at least the contract quotas, i. e., 750,000 barrels per month, until that period of time when salt water enormously reduced the supply. This we have been unable from the record to do. Such a finding would in its very nature express no more than the usual indefiniteness of an estimate predicated upon a guess.
As to plaintiff’s second contention in this respect, an entirely different situation prevails. The plaintiff did produce during the contract period, and could have actually delivered to the defendant, 1,548,066.55 barrels of crude oil over and above the quantities actually delivered and paid for. This quantity of crude oil the defendant did not call for and refused to take. Plaintiff disposed of all this oil, as set forth in Finding XI, and unless the defendant’s general defense under the express terms of the contract is in *172 •vulnerable the plaintiff is entitled to judgment in accord with Finding XI for its loss under the crude oil provisions of the contract, keeping in mind the provisions of the contract which absolved the plaintiff from supplying exact quantities monthly if its wells deteriorated to such an extent as to render it impossible to do so, as well as prior commitments to third parties.
The fuel oil provisions of the contract are clearly more difficult of solution that those of the crude oil. At the time the contract was executed both parties to the agreement were-aware that the plaintiff could not for some time supply the contract quotas of fuel oil at Tecomate, Mexico, for the very obvious reason that plaintiff possessed no refineries, and fuel oil is a refined product from crude oil. Therefore the parties mutually agreed that the plaintiff might supply whatever quantities of fuel oil the defendant called for at points of delivery other than Tecomate, Mexico. This is emphatically confirmed by the fact that the defendant actually accepted delivery of fuel oil at points other than Tecomate.
Plaintiff had in course of construction at Tecomate a refinery, or,-así designated, a “topping plant,” with a capacity of 300,000 barrels of fuel oil-per month. This plant was put into partial operation aboujt April 17, 1921, and finally completed on June 2, 1921. The maximum capacity of this plant would, of course, have been insufficient to meet the contract requirements for fuel oil, and the plaintiff contemplated and had planned ,the construction of a second “ topping plant,” and would have gone forward with its completion, for plans and specifications had been adopted and some material assembled toward its construction. We think it clearly proved that it could have been completed and put in operation by July 15, 1921. The plant was never completed because on or about May 18, 1921, the board notified the plaintiff that it would take no more fuel oil under the contract. The defendant did, however, despite this notice, call for and accept delivery of practically all the fuel oil taken, subsequent to the date of this notice. (Finding III.) The Shipping Board received and paid for 517,528.19 barrels *173 of fuel oil, most of which was taken subsequent to May 18, 1921. The plaintiff could have supplied 1,379,634.52 barrels of fuel oil (Finding X), but the defendant declined .to accept it, and damages are now claimed for the quantity of fuel oil the defendant did not take.
Three events characterize the situation respecting fuel oil, first, ,the fact that the defendant, fully informed as to the situation with respect to plaintiff’s inability to deliver the contract quotas of fuel oil at Tecomate, Mexico, entered into the contract knowing fuel oil must be accepted under the contract at other points. Second, the defendant did call for and accept deliveries at other points than Tecomate, and paid for the same without protest. Third, that in the face of a positive refusal to accept deliveries of fuel oil after May 18, 1921, the defendant continued to call for and accept cargoes of fuel oil; in fact, notified the plaintiff to furnish full contract quotas of the same from October, 1921, until the expiration of the contract. There is no doubt, and the record sustains the fact, that the plaintiff negotiated by way of contracts and loans for a supply of fuel oil sufficient to meet the demands of the defendant under the contract; but for one reason or another the defendant did not accept or take but one cargo of fuel oil from January, 1921, until July, 1921, and did nof in any one month accept delivery of the full contract quota. True, the plaintiff was able to escape obligations to third parties for fuel oil which might have ensued from defendant’s failure to accept fuel oil; but the situation was such that the plaintiff did not know from month to month what quantities of fuel oil it might be called upon to supply. The plaintiff therefore insists that its inability ¡to comply with contract provisions as to deliveries of fuel oil at Tecomate, Mexico, was waived, and as a result of such waiver the plaintiff was only released from the obligation of delivering such quantities as it could not deliver at Tecomate, asserting a corresponding obligation upon the defendant to accept deliveries of all the fuel oil the plaintiff could have delivered at Tecomate. We believe the plaintiff is right. The defendant did waive deliveries of fuel oil at Tecomate. (See paragraph 2, Finding
*174 III.) The plaintiff could have met the requirements of the contract by deliveries elsewhere. Adequate preparations were made to that end, but the plaintiff declined to accept the same, except as to quantities of fuel oil it desired to take.
Then on May 18, 1921, the defendant positively declined to go forward with the contract, subsequently reversing its position and calling for fuel oil in July, August, September, November, and December, 1921, accepting deliveries thereof and paying therefor. The plaintiff might have lawfully declined to supply additional fuel oil after May 18, 1921. It did not do so'. On the contrary, it held itself in readiness to comply with defendant’s demands, and received notice that the full contract quotas for October and December would be called for. What was the result? The plaintiff had on hand this large quantity of fuel oil ready and willing to deliver it to the defendant, and the defendant refused to accept only such quantities as it desired. What we intend by this statement is to say that the plaintiff had available a sufficient quantity of crude which it could have refined into fuel oil, but which was not done because it was plain the defendant would not accept it. To have refined the onide oil available for fuel oil would have added expense, and the purchase price of crude and fuel oil was the same, and in no way affects the amount of the judgment. We have computed available fuel oil on the basis of six barbels of crude to one of fuel. The plaintiff could not have done less than it did. After notice for full contract quotas it was the duty of the plaintiff to prepare to meet the requirements of the defendant to the limit of its capacity; the plaintiff did this very thing, and the defendant, ignoring previous requests, left in the possession of the plaintiff this large quantity of additional fuel oil accumulated by the plaintiff to apply on the contract. While t.ime and place may be the essence of the contract as well as quantity, there is no legal impediment to a mutual waiver of any one or all, and courts may deduce a waiver from conduct as well as express language.
The defendant, in addition to disputation of essential facts, confidently relies upon the general exceptions clause of *175 the contract in suit as legally sufficient to relieve the defendant from taking any quantity of crude or fuel oil in excess of its requirements for the year 1921. The general exceptions clause is designated by the defendant as a “ force majeure” clause, and the assertion is made that proof obtains to establish the fact of the Government’s requirements for the year 1921 and they were not in excess of the quantity of oil taken and paid for. The clause in the contract upon which the defendant relies reads in terms as follows:
“ATLANTIC GULF OIL COMPANY
“ If either party to this agreement shall be delayed or prevented from fulfilling any, of the terms and provisions hereof by reason of revolution or other internal disorders, war, acts of enemies, fires, strikes, lockouts, riots, floods, earthquakes, acts of God, arrest and restraint of princes, rulers of peoples, perils of the sea, accidents of navigation, breakdown of or injury to ships, pipe lines, pumping machinery or sea-loading lines, expropriation or confiscation of seller’s properties constituting its source of supply, or, without limiting the foregoing, by any other cause not within the control of the party whose performance is' interfered with and which by the exercise of reasonable diligence it is unable to prevent, whether of the class of causes herein enumerated before or not and wheresoever occurring, no liability for damage or demurrage shall arise against said party, on account of delay■ or prevention due to such cause or causes.
“ It is expressly understood • that the fulfillment of the terms and provisions hereof by the seller is subject to the requirements of the prior obligations of the seller to the Beacon Oil .Company, the Sun Company, the Cia. Refinadora del Agwi, the Agwi Petroleum Corporation, Ltd., and the Cié. Francaise Atlantique des Mazouts et Petroles, and to diminution in and/or failure of the seller’s source of supply of crude petroleum. In the event of such reduction of the seller’s obligation to deliver crude petroleum and/or fuel oil hereunder, then the buyer’s obligation to furnish tank steamers hereunder may at its option be proportionately reduced and charter parties for tank steamers proportionately canceled.”
The defendant resorted to members of the Shipping Board to prove the requirements of the Government for the year involved, and their understanding of the contract. This *176 proof does indicate in a general way that previous to the execution of the contract in suit a survey of the oil needs of the board for 1921 was made and an estimate reached of the quantity of bunker oil required. The estimated quantity finally agreed upon was far in excess of the quantities to be supplied by the plaintiff, and the amount, 40,000,000 .barrels, was allocated among several oil companies other than the plaintiff. Granting arguendo the force of defendant’s contention as to the effect of the exceptions clause, the record relied upon by the defendant to bring the facts within its operation falls far short of the necessities of the case. In the first place, there is not sufficient proof that the defendant called for or accepted the full proportion of its oil requirements from the plaintiff. It is wholly insufficient to predicate the fact upon the general slump of shipping in the year 1921.and the withdrawal of numerous vessels from the trade by the board, and what is more to the point, there is a complete absence of any understanding or mutual assent to the proposition of a simple requirements contract upon the part of the plaintiff.
It would be difficult to deduce from the voluminous record in this case that the parties to this agreement intended other than a sale and purchase of definite quantities of crude and fuel oil, to be delivered at stated times during the year 1921. The case of the International Paper Company v. Beacon Oil Company, 290 Fed. 45, is cited as controlling. Without assenting to the conclusion reached in the cited case, a comparison of the respective situations of the parties in that case and this discloses a wide divergence of facts and a manifest dissimilarity of contractual relationship. In the instant case there are no provisions which even hint at a right to escape contractual obligations except as stated in the exceptions clause. The contractor is nowhere warned to anticipate the ordinary vicissitudes of business or lack of market, or obliged to assume responsibility for their happening. The contract calls for the delivery of the stipulated quantities of oil, as per specifications, “ suitable for use as fuel oil by oil-burning merchant ships under the ownership and/or control of the buyer.” In the case relied upon the contract was a *177 designated-requirements contract between a single vendor and vendee, containing a designated “ force majeure ” clause, accompanied by a showing of requirements below the maximum quantities of oil to be delivered, and an express stipulation against resale by the vendee. No such state of facts exists as to this case, and in the absence of some provision of the contract, positive in its terms, it is impossible to convert a straight-out bargain of purchase and sale into a provisional agreement limiting the stipulated quantities to pass under the contract to buyer’s needs. The exceptions clause in plaintiff’s contract was not unusual; the scope and effect of such provisions are well recognized. Manifestly, what was intended was to escape the ejudem generis rule and relief from liability for causes when performance is physically prevented under circumstances where nonperformance is not legally excused.
We do not believe we need to indulge further comment. The court is not warranted in construing the contract, unambiguous and perfectly plain, by resorting to extraneous testimony in a final effort to convert the agreement into a binding obligation contrary to the terms of the instrument itself. As a matter of general business principles it may not escape observation that it would be most unusual to obligate oneself to furnish during a period of twelve months 1,500,000 barrels of oil and assume the perilous obligation of such wide fluctuations in quantity as this case discloses. The possible loss to the contractor is beyond contemplation, and the manifest uncertainties of the situation so great that nothing but express contractual stipulations to that effect would sustain such a holding.
Under Findings XI and XII the plaintiff is entitled to a judgment for $1,779,922.44. It is so ordered.
Moss, Judge; Hat, Judge; and Campbell, Chief Justice, concur.
Gkaham, Judge, took no part in the decision of this case.