WILLIAM C. ATWATER & COMPANY, INC., Plaintiff, *v.* PANAMA RAILROAD COMPANY, Defendant.

Supreme Court, New York County, August 27, 1928.

Sales — performance or breach — action by seller to recover damages for breach by buyer — contract called for delivery of 36,000 gross tons of coal at rate of 3,000 tons per month — plaintiff did not deliver 3,000 tons each month for first six months though total delivery for that period was at that rate — no proof of custom that contract would be performed if defendant accepted ninety per cent — plaintiff's failure to ship 3,000 tons per month was waived — provision in contract allowing plaintiff to reduce deliveries in case of subnormal production was for its benefit — existence of strike in defendant's colliers justified refu~~' of defendant to accept coal during that period — defendant is liable for damage suffered for refusal to accept contract amount less amount deliverable during strike — defendant is entitled to recover on counterclaim for failure of plaintiff to deliver as agreed during first six months.

The plaintiff agreed to sell and the defendant to buy 36,000 gross tons of coal to be delivered at the rate of 3,000 tons per month, commencing August 1, 1920. The contract provided that the price should be determined according to the cost of production. During the first six months the plaintiff did not deliver 3,000 tons monthly, but at the end of six months it had delivered 18,277 tons. During the seventh and eighth months the amount to be delivered was mutually reduced to 2,000 tons for each month, but· thereafter deliveries were wholly suspended at the request of the defendant except for a small quantity delivered in July. During May and a part of June, a marine strike prevented defendant from operating its colliers, and from making shipments of the coal which it had agreed to purchase.

The failure of the defendant to take the amount stipulated is not justified by an alleged trade custom to the effect that the defendant would fulfill its obligation

by accepting ninety per cent of the amount ordered, for the evidence does not show the existence of such a general custom in the trade.

Breaches of the contract by the plaintiff during the first six months, arising through its failure to deliver approximately 3,000 tons each month, were waived by the defendant which insisted upon the plaintiff completing its contract, and, therefore, while the defendant might have rescinded the contract on that ground it cannot now present those facts as a defense.

A provision in the contract giving the plaintiff the option to reduce the number of tons to be delivered each month, in case of a subnormal production, was for the benefit of the plaintiff and cannot be taken advantage of by the defendant. An agreement to reduce the deliveries for February and March did not tend to reduce the total amount to be delivered under the contract, but was merely a temporary suspension of a part of the monthly deliveries.

The existence of a marine strike, which prevented the defendant from making shipments for a period of six weeks entitled the defendant, under the contract, to have the amount of coal which should have been delivered during that time stricken from the contract.

The plaintiff, having reduced the price to four dollars and seventy-five cents per ton, under the contract, prior to the breach thereof by the defendant, damages are to be determined by the difference between four dollars and seventy-five cents per ton and the market prices prevailing when the defendant should have taken delivery.

The defendant has a good counterclaim for the failure of the plaintiff to deliver 3,000 tons of coal each month during the first six months, and the fact that it continued to demand performance of the contract did not amount to a waiver of its right to insist upon damages for the breach.

ACTION to recover damages for defendant's refusal to accept and pay for coal undelivered under contract with plaintiff.

*Bassett, Thompson & Gilpatric* [*Wilson W. Thompson* of counsel], for the plaintiff.

*Richard Reid Rogers*, for the defendant.

FRANKENTHALER, J.   By written contract the plaintiff was to sell and the defendant was to buy 36,000 gross tons of coal, deliverable in approximately equal monthly quantities of 3,000 tons from August 1, 1920, to July 31, 1921.   It was provided that deliveries should be subject to causes beyond the seller's control, and that if the production of specified mines should for any of such causes be less than their normal maximum, the tonnage to be delivered under the contract might, at the seller's option, be reduced proportionately without resulting liability.   Another provision protected the buyer in the event of a suspension of deliveries at its request because of strikes or accidents stopping or interfering with its works or business.   The price was four dollars per net ton as of April 1, 1920, it being further provided that the contract price was based upon the then cost of production, and that it should be changed from time to time as such cost should vary, the seller's estimate to be controlling.   Against the 3,000 tons called

45

for monthly, the plaintiff for the first six months made the following deliveries: 1,572.12 gross tons in August; 1,335 gross tons in September; 3,438.20 gross tons in October; 1,577.15 gross tons in November; 4,956.60 gross tons in December, and 5,397.11 gross tons in January. In October and November the defendant called attention to the heavy shortages and begged for more coal. The plaintiff assured the defendant that it would exert itself to meet the figure of 3,000 tons a month and to make up for past deficiencies. The deliveries in December and January were heavy enough to accomplish this. It will thus be seen that while the deliveries in these months were not uniform they totaled 18,277 tons, against the contract figure of 18,000 tons for the first six months. By January, 1921, the coal situation had changed from one of acute shortage to one of overproduction. Prices had fallen off sharply. The defendant then instructed the plaintiff to make no more overshipments, following which it requested the plaintiff to limit the February and March shipments to 2,000 tons. This the plaintiff agreed to do. In February 2,803.88 gross tons were delivered and in March 374.40. From that time on until the close of the contract period deliveries were wholly suspended by request of the defendant and by its failure to give orders, except for a quantity taken in July amounting to 2,011.96 gross tons. From about May first to June sixteenth a marine strike paralyzed the defendant's colliers, resulting in a total suspension of its shipments of coal to Panama. In consequence of these circumstances the defendant received and paid for only about 23,467 tons, declining to take the balance of the 36,000 tons. In partial justification for this refusal the defendant attempted to prove at the trial the existence of a trade custom to the effect that under contracts of the sort here involved the buyer has a ten per cent leeway; in other words, that the buyer fulfills its obligations by taking only ninety per cent of the tonnage specified in the contract. The plaintiff produced expert witnesses who denied that there was any such custom applicable to the instant contract. The evidence established, moreover, that the plaintiff's mine production of coal for the months of August, September, November and certain other months was subnormal, due to causes beyond its control, and that accordingly, under the clause in the contract covering such contingency, its obligation to furnish 36,000 tons might have been appropriately reduced at its option without consequent liability on its part. The plaintiff has brought this action to recover damages for the defendant's refusal to accept and pay for the 12,533 undelivered tons. In its answer the defendant in effect admits the non-acceptance of this tonnage and

relies upon several affirmative defenses. A counterclaim for damages sustained by reason of the short deliveries in the months of August, September and November is also interposed. By stipulation the case has been tried before me without a jury. The written contract having required the defendant to accept and pay for 36,000 tons, and the latter having declined to accept more than 23,467 tons, it is clear that it must respond in damages for its failure to take this tonnage unless it can point to some provision of the contract or to some conduct on the part of the plaintiff which will operate to wipe out or to diminish its *prima facie* liability. It becomes necessary, therefore, to examine the several matters relied upon by the defendant as warranting its refusal to take the coal. One of these defenses is that by virtue of the alleged trade custom or usage referred to previously, the defendant's maximum obligation was to take only 32,400 tons instead of 36,000 tons. I find, however, that the defendant has failed to sustain the burden of proving the existence of such a custom, and that accordingly the defendant's express engagement to purchase 36,000 tons was not diminished by force of the alleged custom. The defendant also contends that the plaintiff's repeated breaches in failing to make the required monthly deliveries at the outset disables the latter from complaining of any later breach by the defendant. This defense seems clearly untenable. If we assume that the plaintiff's short deliveries constituted a breach of such materiality as to have justified the defendant in refusing to proceed further under the contract (Pers. Prop. Law, § 126), the fact remains that the defendant did not adopt any such course. Instead, it insisted upon continued performance by the plaintiff and proceeded with further performance on its own part until all defaults by the plaintiff had been made good. Such conduct was a plain waiver of the plaintiff's breach, so far as any right of rescission by the defendant was concerned. (Williston Cont. § 856.) The defendant also urges that since the production of the mines was below their normal maximum for several months, the clause in the contract providing for a proportionate reduction in the tonnage operated to reduce by about 7,000 tons the amount of coal to be delivered. I cannot adopt this contention. The possible reduction of tonnage due to subnormal production at the mines was to be effective only " at the option of the seller." This clause of the contract was never availed of. The defendant steadfastly demanded its 3,000 tons a month, and the plaintiff repeatedly admitted its obligation to deliver at this rate. It never took refuge under the reduction clause. On the contrary, it proceeded to make up the deficits and brought deliveries up to the contract rate of 3,000

tons a month. The defendant also maintains that the parties agreed upon reductions of the monthly deliveries to 2,000 tons for February and March, and that the contract was thus modified to the extent of cutting down by 2,000 tons the total amount of coal to be sold. It is undoubtedly true that these modifications for February and March were agreed upon, but it does not follow that a diminution in the total tonnage covered by the contract, below 36,000 tons, was ever assented to. The more natural inference from the correspondence is that these 2,000 tons were to be delivered in later months, and that what was consented to was a postponement of deliveries, not a reduction in the total tonnage. A final contention is that the existence of the marine strike, resulting in the tying up of the defendant's collieries for one month and sixteen days, excused the defendant to the extent of 4,500 tons. With this I am in agreement. The contract contained an express provision relieving the defendant in the event of strikes causing a stoppage or partial stoppage of its works or business, and part of the defendant's business was the transportation of coal to Panama. Strike clauses should receive a reasonable rather than a narrow interpretation (*Delaware, etc., R. R. Co.* v. *Bowns*, 58 N. Y. 573; *International Paper Co.* v. *Beacon Oil Co.*, 290 Fed. 45), and it would be a very strict construction that would limit the clause in this case to the occurrence of a strike on the defendant's railroad in Panama. To the extent of the tonnage apportionable to the period of the strike (which appears to be about 4,500 tons), the defendant's obligation to receive coal was canceled. I, therefore, find that the defendant was obligated to take and pay for 31,500 gross tons. Having taken only 23,466 gross tons, the defendant must respond in damages for its refusal to accept the remaining 8,033 gross tons. Upon the facts of this case 1,625 of said tons were deliverable in March; 3,000 tons in April; 1,500 in June, and the balance, 1,908 tons, in July, 1921. The contract price for deliveries in this period having been fixed at $4.75 per net ton, the plaintiff is entitled to the difference between this figure and the market prices prevailing when the defendant should have taken delivery. I, therefore, compute the plaintiff's damages at $4,005.47 for the March deliveries; $6,854.40 for April; $3,427.20 for June, and $4,808.86 for July, or an aggregate of $19,095.93. The plaintiff is entitled to interest on these amounts. (See Civ. Prac. Act, § 480.) Since the contract provided that payments were to be made in cash by the fifteenth of the following month, interest will run from April 15, 1921, May 15, 1921, July 15, 1921, and August 15, 1921, respectively. In computing the damages I have considered the plaintiff's argument that the contract price

after January, 1921, continued to be $5.046879 per net ton, but have rejected it. The reduction made by the plaintiff in February, 1921, to $4.75 per net ton was in accordance with the written contract, which made the price flexible, to correspond to the cost of production, and was effective for all purposes. There was no condition attached to the effect that the reduced price was to apply only to coal accepted by the defendant. It remains only to consider the defendant's counterclaim, based upon the plaintiff's failure to make the required deliveries in August, September and November of 1920. Admittedly the plaintiff's deliveries in these months fell far below the 3,000-ton requirement. The plaintiff relies upon the clause permitting a proportionate reduction in the event of subnormal output at the mines, as in large part justifying the reduced deliveries. However, as previously pointed out, the plaintiff did not see fit to exercise its option in this respect. The conditions at the time were such as to give it the right, if it so chose, to deliver reduced amounts, in which event the undelivered portions would have been canceled rather than postponed. (*Normandie Shirt Co.* v. *Eagle, Inc.,* 238 N. Y. 218.) But, instead of availing itself of this privilege, it repeatedly recognized that the 3,000 tons monthly were due and later made the necessary deliveries to overcome the past shortages. Indeed, the plaintiff has always adhered to the position that the contractual obligation was for 36,000 tons and no less. This is inconsistent with any exercise by the plaintiff of the option whereby " the tonnage to be delivered under the contract " might for certain causes be reduced. I am of the opinion, therefore, that the defendant has established a valid cause of action on the counterclaim. Furthermore, there was no waiver of this right of action in the defendant's acceptance of the later deliveries. As already indicated, the defendant undoubtedly forfeited thereby its right to declare the contract at an end, but it did not also waive its right to recover damages for the breach. This distinction is well settled. (Pers. Prop. Law, § 130; *Crocker-Wheeler Co.* v. *Varick Realty Co.,* 104 App. Div. 568.) The referee's report on the former trial of this action is not a bar to a consideration of the counterclaim on the merits. (*Taylor* v. *N. Y. Life Ins. Co.,* 209 N. Y. 29.) The evidence establishes that the defendant was damaged at least to the claimed amount of $2,122.52, which, with interest from December 1, 1920, it is entitled to recover from the plaintiff. All motions to strike out on which decision was reserved are denied, with appropriate exceptions. Motions for direction of verdict are granted to the extent indicated herein. The findings of fact submitted have not been passed upon. The parties will submit new findings in accordance with this opinion.